# Mathiot's Estate.

*Contracts—Illegal contracts—Money loaned under an illegal contract—Recovery.*

1. The law favors the continuance of the marriage relation; it does not favor divorce. Contracts having for their object the procurement of divorce or facilitating the procurement thereof are illegal and money loaned under such contracts cannot be recovered.

2. Where at the audit of an executor's account the wife of the decedent claimed for money loaned decedent and it appeared that the claimant had made the loan to enable the decedent to procure a collusive divorce so that he might marry the claimant; that the divorce was procured and the contemplated marriage entered into, the court properly disallowed the claim.

Argued Oct. 31, 1913. Appeal, No. 261, Oct. T., 1913, by Laura H. Mathiot, from decree of O. C. Allegheny Co., April T., 1913, No. 130, dismissing exceptions to adjudication in Estate of Edward B. Mathiot, deceased. Before FELL, C. J., BROWN, POTTER, ELKIN and MOSCHZISKER, JJ. Affirmed.

Exceptions to adjudication.

Upon the audit of the account MILLER, J., filed the following opinion:

The question is, whether decedent's present wife can maintain a claim for $15,000.00 received by him from her and used with her knowledge by him to procure a divorce from his former wife, a subsequent marriage between claimant and the decedent being then in contemplation

### THE FACTS.

1. Doctor Mathiot was first married in 1886; from this marriage were born two children, a son, Karl, and a daughter, Miriam; he was a physician with an established reputation as a specialist and having a practice estimated worth $25,000.00 a year. At the time of the

separation, hereinafter referred to, his then wife was the record owner of what has been described as No. 5912 Walnut street, in the City of Pittsburgh, while he was the record owner of the adjoining property, No. 5914; the two properties constitute one large building, but then completely separated by division walls and made up two separate residences.

2. In 1903, the claimant, then Mrs. Laura H. Taylor began to be Doctor Mathiot's patient; for a short time statements were rendered to her for professional services; later she became a very constant and frequent visitor at his office; these visits were more personal than professional; she remained after office hours, frequently leaving with him; no statements or bills were rendered after this character of visits began; their relations became very friendly and affectionate and so continued.

3. About 1907 a permanent estrangement took place between Doctor Mathiot and his then wife, Katherine; he refused to provide for her and his children unless she procured an absolute divorce from him; she moved from this State and took up her residence in Ohio. By arrangement between him and his wife a divorce was to be obtained upon the payment to her of $10,000.00 as alimony and $5,000.00 in settlement of a debt he owed to her father or to her father's estate. Proceedings for divorce were instituted in Ohio on August 1, 1907, the cause alleged was extreme cruelty and neglect; other grounds discussed by counsel were not by arrangement set forth in the libel. By collusive agreement Doctor Mathiot went to Youngstown in the State of Ohio, and on August 2, 1907, accepted service of the summons; in the meanwhile, to wit: in the early part of 1908, he gave up his house on Walnut street, took rooms at the Hotel Lamont adjoining those of the claimant; their affectionate relationship continued, he giving her many presents and various money transactions took place between them.

4. On February 10, 1908, notice was passed between

the parties or their counsel that Doctor Mathiot was ready with his money; following this, on February 12th, a decree of divorce was obtained; on February 13th, the claimant gave the decedent a check for $15,000.00, he stating in her presence when the money was obtained at her bank that they intended to be married; the next day the money was paid to Mrs. Mathiot's counsel. On the 18th of April following, the decedent and the claimant were married.

5. From the foregoing facts, their sequence, the relationship of the parties, and the weight of all the testimony, the further fact is found that the claimant knew that the $15,000.00 she gave to the decedent then was to be used in the procurement of the divorce from his first wife in order that she and Doctor Mathiot might be married.

6. Shortly after their marriage the doctor and the claimant had constant quarrels about money matters; she demanded interest on this money transaction, a check for $375.00 is offered in evidence tending to show such interest was paid; the claimant demands interest from the date when the money was advanced without allowing this credit. Shortly following Doctor Mathiot's death the claimant, in answer to questions as to his debt, stated she knew of none except current bills; she did not then state that she had this claim or the one subsequently referred to. She did, however, later take up the question of these claims with her present counsel, who in reasonable time gave notice of the same.

### THE LAW.

Was the use of claimant's $15,000.00 known by her as the purchase price between Doctor Mathiot and his first wife as a consideration for an absolute divorce collusively obtained between them, followed by claimant's marriage to him in accordance with their clear intention, against public policy?

Certain well-known principles must be kept in mind

in arriving at a just conclusion. The law favors the continuance of the marriage relation; it does not favor divorce; contracts having for their object the procurement, or facilitating the procurement of divorce, are illegal. Claims against a dead man's estate based on parol evidence must be rigidly scanned; if they might have been enforced against him while living they are the subject of just suspicion; these principles are so generally stated in text books, in encyclopædias of law, in adjudicated cases including many in Pennsylvania, that specific reference to a few only need be made in support thereof.

With special application to the facts in this case, it is held in Noice v. Brown, 38 N. J. L. 228, that a contract of marriage made by a man then married to take effect upon his obtaining a divorce from his then wife is illegal and void; so in Leupert v. Shields, 60 Pac. Repr. 193. In Pennsylvania it is well settled that divorce must never be obtained "through levity or by collusion": Hoffman v. Hoffman, 30 Pa. 417; a contract between the husband and wife pending proceedings in divorce, by which she should be paid money, the consideration for which was that she should not oppose the divorce is void: Kilborn v. Field, 78 Pa. 194. A bond to facilitate divorce proceedings cannot be collected: Sampson v. Cresson, 6 Philadelphia 229; contracts prejudicial to the convenience and welfare of the public must not be enforced, no matter how flagrant and malicious the breach of it by one of the parties: Irvin v. Irvin, 169 Pa. 529.

Whether courts will refuse to enforce such contracts or leave the parties where they have placed themselves depends upon the circumstances; as between themselves it is a well recognized policy ordinarily to leave the parties alone, but when it concerns others, as in this case, the public to whom the sanctity of the marriage relation is one of the most important considerations of life, and the children of Doctor Mathiot, who by the allowance of this illegal claim, are largely deprived of their patri-

mony in their father's estate, the consideration is of an entirely different character.

As early as in Collins v. Blantern, 2 Wilson 341, decided in 1765, a vicious consideration strikes at the contract itself and destroys its legal entity; it is immaterial whether the contract be to stifle a prosecution for perjury, as therein set forth, or to enter into a contract for marriage by one already married, as set forth in Kilborn v. Field, 78 Pa. 194, it is based on iniquity; its allowance would be to favor that which is highly impolitic, scandalous, and necessarily illegal; it is against the security of society and good morals.

Applying these principles to the facts in this case, wherein without the shadow of a doubt this claimant knew that her money was being used to procure a collusive divorce and her purpose was marriage with Doctor Mathiot, it is immaterial whether the amount was the price she was willing to pay for her husband or whether it was a loan; whether her relations with the decedent were the instigating cause or the result of the estrangement between the husband and his former wife; she was the active participant therein, and her money opened the door for her marriage, the consummation of which was impossible so long as there was no divorce; this money used as found by the facts cannot be recovered back: Waugh v. Beck, 114 Pa. 422. The atmosphere surrounding the relations of the claimant and Doctor Mathiot; the divorce and the money paid in connection with it is vitiated and no competent evidence has cleared it up.

In so concluding, little consideration is given to the inconsistencies and contradictions that appear in connection with this claim such as the variation with respect to the demand for interest, or that she stated after the doctor's death, that she knew of no claims against her husband's estate and refrained from mentioning what it is asserted is this belated one; the claim is refused wholly, because the facts clearly bring it within the line

of cases which courts cannot enforce, unless public policy and good morals are wholly eliminated.

The court dismissed the exceptions.

*Error assigned,* among others, was in dismissing the exceptions.

*John O. Wicks,* with him *John S. Weller,* for appellant.

*Willis F. McCook,* with him *Charles A. Woods,* for appellees.

PER CURIAM, January 5, 1914:

The decree of the Orphans' Court is affirmed on the findings of fact and conclusions of law by Judge MILLER.